IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| v. | § § | 1:19-CV-714-RP |
| WILLIAM J. MILLES, JR. and DONALD J. LUTZKO, | § § § § | |
| Defendants. | § § | |

# ORDER

Before the Court is Plaintiff Securities and Exchange Commission's ("SEC") Motion for Summary Judgment,[1] (Mot. Summ. J., Dkt. 51), Defendants William J. Milles, Jr. and Donald J. Lutzko's ("Defendants") Response, (Resp., Dkt. 64), and the SEC's Reply, (Reply, Dkt. 65). Having considered the parties' submissions, the record, and the applicable law, the Court will grant the SEC's motion.

## I. BACKGROUND

This case concerns an investment program with the purported goal to raise funds for new and existing drilling projects in Texas and Oklahoma. Milles acted as CEO and Lutzko as President of the entity managing the investment program, Capital Energy Group, LLC ("CEG"). (Lutzko Dep., Dkt. 58, at 29; Rosselli Decl., Dkt. 57-1, at 25, 34; March 23, 2016 Email, Dkt. 57-1, at 28). To garner investments, Defendants created five investment funds titled the "Cap E" oil funds, and each of the five individual funds was given a roman numeral, such as Cap I and Cap IV. (*See generally* Dkt.

---

[1] While the SEC titles its motion "Motion for Partial Summary Judgment," the motion itself makes clear that the SEC is seeking summary judgment on all three of its claims for relief. (*See* Mot. Summ. J., Dkt. 51, at 1, 21, 29).

1

52-1; Dkt. 53; Dkt. 54; Dkt. 55; Dkt. 56-1). The Cap E funds offered investors the opportunity to invest in "units" to provide capital for new and existing oil wells. (*See, e.g.*, Coate Decl., Dkt. 57, at 25–26; Subscription Agrmt., Dkt. 57, at 34; Milles Dep., Dkt. 58 at 40). Investors were told they would receive regular production payments as a result of their contribution(s). (*See* Dkt. 56-1, at 12, 33).

Defendants found investors through a nationwide cold-calling campaign performed by contract salesmen. (Milles Dep., Dkt. 58, at 51). Between July 2014 and March 2017, Defendants raised $3,895,982.72. (Hahn Decl., Dkt. 59-1, at 4).[2] The SEC alleges in its Complaint that Defendants "lured these investors with oral and written promises of guaranteed returns of 227 to 363 percent over" six years, (Compl., Dkt. 1, at 5), but that their pitch to investors contained materially false and misleading statements regarding historical and projected oil production, falsely guaranteed monthly production payments "regardless of the price of oil," and failed to disclose prior regulatory actions against oil-and-gas entities controlled by Milles, (*id.*).

The Complaint further alleges that Defendants used the investment funds they received for their own personal gain and to perpetuate their fraudulent investment scheme. (*Id.* at 11). First, the SEC asserts that—because the Cap E projects did not ever generate any actual revenue—the "production" payments sent to investors were funded by investors' own capital contributions, amounting to a Ponzi scheme. (*Id.* at 12). Second, the Complaint states that Defendants misused investor funds to pay for the contract salesmen conducting the cold-calling campaign and for Defendants' own personal expenses. (*Id.* at 12–13). In light of these allegations, the SEC makes three claims for relief against Defendants for their purported violations of: (1) Section 10(b) and 10b-5 of

---

[2] In response to questions regarding the total amount raised, Lutzko exercised his 5th Amendment right to remain silent, (Lutzko Dep., Dkt. 58, at 82), while Milles agreed with the statement that CEG raised "at least $3.9 million," (Milles Dep., Dkt. 58, at 50).

the Exchange Act (17 C.F.R. § 240.10b-5); (2) Section 17(a) of the Securities Act (15 U.S.C. § 77q(a)); and (3) Sections 5(a) and (c) of the Securities Act (15 U.S.C. §§ 77e(a) & (c)).

In their individual answers, Defendants deny that they misled investors by promising oil production payments. (Lutzko Answer, Dkt. 12, at 2; Milles Answer, Dkt. 13, at 3). Instead, in both Lutzko's Answer and Defendants' joint response opposing the SEC's Motion for Summary Judgment, Defendants assert that an individual named Russell Vera ("Vera"), the alleged operator of an oil and gas company called Fortune Oil and Gas, was responsible for falsifying ownership leases and production reports, which Defendants relied upon when communicating with potential investors. (Lutzko Answer, Dkt. 12, at 10, 14; Resp., Dkt. 64, at 2). In sum, they allege it was Vera, and not Defendants, who was responsible for any fraudulent or misleading information passed on to investors. (*Id.*).

## II. LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is material if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotations and footnote omitted). When reviewing a summary judgment motion, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. Further, a court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

When, as here, the movant bears the burden of proof, she must establish all the essential elements of her claim that warrant judgment in her favor. *See Chaplin v. Nations Credit Corp.*, 307 F.3d 368, 372 (5th Cir. 2002). In such cases, the burden then shifts to the nonmoving party to establish the existence of a genuine issue for trial. *Austin v. Kroger Texas, L.P.*, 864 F.3d 326, 335 (5th Cir. 2017). Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Furthermore, the nonmovant is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.* After the nonmovant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted. *Miss. River Basin All. v. Westphal*, 230 F.3d 170, 175 (5th Cir. 2000).

## III. DISCUSSION

### A. Defendants Violated Section 17(a) of the Securities Act (15 U.S.C. § 77q(a)) and Section 10(b) (15 U.S.C. § 78j(b)) and 10b-5 of the Exchange Act (17 C.F.R. § 240.10b-5)

The SEC seeks summary judgment on each of its three claims for relief. Its first two claims are that Defendants violated Section 17(a) of the Securities Act and Section 10(b) and 10b-5 of the Exchange Act. "Because the basic precepts of Sections 17(a) and 10(b) and Rule 10b-5 are the same, they will be analyzed as one herein." *SEC v. Helms*, No. A-13-CV-01036 ML, 2015 WL

4

5010298, at *12 (W.D. Tex. Aug. 21, 2015) (citing *SEC v. Spence & Green Chem. Co.,* 612 F.2d 896, 903 (5th Cir.1980) ("[T]he proscriptions of section 17(a) are substantially the same as those of section 10(b) and rule 10b-5.")). Section 17(a) makes it unlawful to "employ any device, scheme, or artifice to defraud," "obtain money or property" by using material misstatements or omissions, or to "engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a). Section 10(b) and Rule 10b-5 thereunder prohibit fraud in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5. Section 10b-5 states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> a. To employ any device, scheme, or artifice to defraud,
>
> b. To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or,
>
> c. To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

(*Id.*).

To show a violation of Section 17(a), Section 10(b), and 10b-5 thereunder, the SEC must show "(1) material misrepresentations or materially misleading omissions, (2) in connection with the purchase or sale of securities, (3) made with scienter." *SEC v. Seghers*, 298 F. App'x 319, 327 (5th Cir. 2008). The standard for misrepresentation is "whether the information disclosed, understood as a whole, would mislead a reasonable potential investor." *Trust Co. of La. V. N.N.P. Inc.*, 104 F.3d 1478, 1490 (5th Cir. 2008). Scienter is defined as a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).

1. The SEC offered evidence that Defendants engaged in material misrepresentations

As the movant with the burden of proof at trial, the SEC must establish all three elements of liability under Section 17(a), Section 10(b), and 10b-5 thereunder. Thus, first, the SEC must offer summary judgment evidence that Defendants engaged in material misrepresentations or misleading omissions. *See* 15 U.S.C. § 77q(a); 17 C.F.R. § 240.10b-5(b); *Seghers*, 298 F. App'x at 327. In support, the SEC offers evidence that Defendants misrepresented the production levels of multiple of the Cap E funds. In their executive summary of the Cap I fund sent to investors, Defendants stated that the Parish Petroleum leases in Tulsa, Oklahoma—that they were seeking investors for—had produced "approximately 200,000 barrels of oil to date." (Dkt. 52-1, at 3). However, in an uncontradicted, sworn expert report provided by Dr. Richard Strickland ("Strickland"), a petroleum consultant, Strickland states that the Parish Petroleum map in the Cap I executive summary "portrays nonproducers as producing wells," and states that the cumulative production for the wells in the Cap I fund was not 200,000 barrels, but was, in fact, only 593 barrels. (Strickland Report, Dkt. 56-2, at 5, 21).

Similarly, the executive summaries for the Cap II and Cap III funds portrayed to investors that certain wells in Guadalupe County, Texas were producing oil, (Dkt. 53, at 3, 9), when Defendants had been made aware that those wells were inactive, (Strickland Report, Dkt. 56-2, at 24). Other Cap E funds contained similar misrepresentations. (*Compare* Dkt. 56, at 3 (executive summary given to investors discussing potential Cap V investment opportunities for wells in Tulsa County, Oklahoma) *with* Strickland Report, Dkt. 56-2, at 27 (stating that none of the leases mentioned in the Cap V executive summary "are in Tulsa, Oklahoma").

The SEC also offers evidence that Defendants misrepresented both the returns investors would receive and Defendants' own professional experience. (Mot. Summ. J., Dkt. 51, at 24–25). Defendants guaranteed in writing that investors would receive 72 payments from the Cap E oil

6

production projects. (*See, e.g.*, February 4, 2016 Email, Dkt. 57, at 32) (stating that investor Dallas Coate would receive "the full 72 payments in the offering"). However, such production payments were impossible because CEG had no operational wells. (Strickland Report, Dkt. 56-2, at 24). The SEC also asserts that Defendants materially misrepresented their own professional experience to investors: The executive summaries stated that Milles' "personal ethics and reputation for integrity" drive CEG, (Dkt. 52-1, at 5), while both gave investors the impression that they were experienced and successful in the oil and gas business, (*see, e.g.*, Coate Dec., Dkt. 57, at 25). However, the SEC's summary judgment evidence suggests that these representations were falsehoods. Sarah Mallett ("Mallet"), a staff attorney at the SEC, offered a sworn declaration that, while on a phone call with Lutzko, he stated that "[h]e did not have any experience in oil and gas operations." (Mallet Dec., Dkt. 59, at 3). Further, Milles had previously owned an oil and gas company called American Energy Oil & Gas, which was ordered to cease and desist after reaching out to inexperienced and unaccredited investors. (Dkt. 59, at 128). Considering this evidence, the Court finds the SEC has met its burden to establish that Defendants engaged in material misrepresentations.

    <u>2. The SEC offered evidence that Defendants employed a scheme to defraud investors</u>

The SEC offered summary judgment evidence that Plaintiffs employed a scheme to defraud investors. *See* 15 U.S.C. § 77q(a); 17 C.F.R. § 240.10b-5(a), (c); *Seghers*, 298 F. App'x at 327. The SEC asserts that Defendants' primary method of defrauding investors was by offering regular oil "production" payments that were, in reality, paid using other investors' money. (Mot. Summ. J., Dkt. 51, at 26). "In a Ponzi scheme, investors are promised high returns on their investments, and prior investors are paid distributions from new investors' contributions, rather than a legitimate, underlying business concern." *See Janvey v. DSCC, Inc.,* 712 F.3d 185, 188 n.1 (5th Cir. 2013) ("A 'Ponzi scheme' typically describes a pyramid scheme where earlier investors are paid from the investments of more recent investors, rather than from any underlying business concern, until the

scheme ceases to attract new investors and the pyramid collapses."). Commingling of funds is a common characteristic of a Ponzi scheme. *Helms*, No. A-13-CV-01036 ML, 2015 WL 5010298, at *13. Such a securities-fraud scheme can constitute a violation of Securities Act Section 17(a), Exchange Act Section 10(b) and Rule 10b-5 promulgated thereunder. *Id.* at *15.

The SEC's evidence supports its allegation that Defendants' oil investment scheme was a Ponzi scheme. Indeed, Defendants never received any oil and gas revenue, and "used investor funds to make return-on-investment—or 'Ponzi'—payments to earlier investors." (Hahn Decl., Dkt. 59-1, at 4–5; *see also* Mallet Decl., Dkt. 59, at 2). When payments to investors were delayed or ceased, Defendants explained themselves by stating oil production was "ramping up" and "on track," even though no production existed and previous payments to investors had been made using other investors' funds. (Dkt. 59, at 9). After Defendants ran out of money and "production" payments ceased, Defendants sought to avoid detection of their scheme by sending letters to investors assuring them that payments would resume. (*See, e.g.*, *id.*; Rosselli Decl., Dkt. 57-1, at 2–3). The SEC notes that these attempts to avoid detection are characteristic of a scheme to defraud. *See SEC v. Holschuh*, 694 F.2d 130, 143–44 n.24 (7th Cir. 1982) ("A scheme to defraud may well include later efforts to avoid detection of the fraud.").

The SEC also offers evidence that Defendants misappropriated investors' funds for unauthorized and undisclosed uses. *See SEC v. Zandford*, 535 U.S. 813, 813–14 (2002) (holding that misappropriation of investors' funds can be indicative of a scheme to defraud). For example, while Defendants represented to investors that they would not use investor funds to pay non-employee salesmen, (Dkt. 56-1, at 52), they brought on two contract sales representatives, (Milles Dep., Dkt. 58, at 51). Overall, the SEC's evidence establishes that CEG's investment program constituted a scheme to defraud investors.

<u>3. The SEC established that Defendants acted with scienter, intending to defraud investors</u>

The SEC offered sufficient summary judgment evidence establishing that Defendants acted with intent to defraud CEG's investors. *Seghers*, 298 F. App'x at 327 (stating that to violate Section 17(a) of the Securities Act and Sections 10(b) and 10b-5 of the Exchange Act, a defendant must act with "scienter"). Scienter is defined as a "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst*, 425 U.S. at 193 n.12. Defendants were the only signatory on CEG's Cap E Fund accounts and knew what was happening in the accounts. (Lutzko Dep., Dkt. 58, at 81; Mallet Decl., Dkt. 59, at 2–3). Further, Defendants directly communicated with investors regarding investors' "production" payments. (*See, e.g.*, Coate Decl., Dkt. 57, at 27). As the only signatories on the bank accounts and the individuals managing the "production" payments, Defendants would have been aware that there was, in fact, no oil production and that all payments to investors were being made using other investors' funds. (*See supra* Section III.A.1). Even so, Defendants repeatedly deceived investors by stating that the payments investors received were from oil production and by reassuring investors that production payments would continue even after the Cap E Funds ran out of money. (*See id.*; Rosselli Decl., Dkt. 57-1, at 2–4). Overall, the SEC offered sufficient summary judgment evidence to establish that Defendants violated Section 17(a) of the Securities Act and Section 10(b) and 10b-5 of the Exchange Act.

**B. Defendants Violated Sections 5(a) and 5(c) of the Securities Act (15 U.S.C. §§ 77e(a), (c))**

The SEC offered sufficient evidence to establish that Defendants offered and sold unregistered securities in violation of Sections 5(a) and 5(c) of the Securities Act. 15 U.S.C. § 77e(a), (c). These provisions prohibit the unregistered offer or sale of securities in interstate commerce unless an exemption from registration applies. *SEC v. Continental Tobacco Co. of S.C.*, 463 F.2d 137, 154–55 (5th Cir. 1972). Offerors and sellers of unregistered securities face strict liability—good faith does not provide an exception. *Swenson v. Englestad*, 626 F2d 421, 424 (5th Cir. 1980); *Holschuh*, 694 F.2d at 137 n.10. To establish a *prima facie* case for a violation of Sections 5(a) and 5(c), the

9

Commission must prove that: (1) defendants, directly or indirectly, offered or sold securities; (2) no registration was in effect or filed with the Commission for the offer or sale of those securities; and (3) interstate transportation, communication, or the mails were used in connection with the offer and sale. 15 U.S.C. §§ 77e(a), (c); *Swenson*, 626 F.2d at 424–25; *Continental Tobacco*, 463 F.2d at 155.

As to the first requirement, the Cap E partnership units sold to investors were investment contracts, which are securities under Section 2(a)(1) of the Securities Act. 15 U.S.C. § 77(b). Further, the securities were not registered. (Mallett Decl., Dkt. 59, at 3). Finally, both Defendants admitted that the interests were offered and sold through interstate commerce. (Lutzko Answer, Dkt. 12, at 5; Milles Answer, Dkt. 13, at 3). As the SEC established a *prima facie* case for a violation of Sections 5(a) and 5(c) of the Securities Act, the burden falls on Defendants to demonstrate that the securities they offered were exempt from the requirements of Section 5. *Continental Tobacco*, 463 F.2d at 156. However, Defendants make no attempt to demonstrate an exemption. (*See generally*, Resp., Dkt. 64). As such, the SEC has established that Defendants violated Sections 5(a) and 5(c) of the Securities Act.

### C. Defendants Did Not Produce Evidence Sufficient to Create a Fact Issue

In response to the SEC establishing each of their claims for relief using competent summary judgment evidence, Defendants are required to come forward with their own competent summary judgment evidence to establish the existence of a genuine fact issue. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. Defendants have not met their burden. Multiple evidentiary issues plague Defendants' responses to the SEC's inquiries and summary judgment motion. First, both Defendants invoked their Fifth Amendment privilege and refused to answer questions regarding material issues during their depositions. For example, Milles and Lutzko invoked the privilege in response to questions about their misleading statements regarding oil production and the returns investors would see, (Milles Dep., Dkt. 58, at 51; Lutzko Dep., Dkt. 58, at 86–87); their attempts to hide their scheme

when production payments to investors ceased, (*id.* at 89, 91; Milles Dep., Dkt. 58, at 55); and their use of investor funds pay "production" payments, (Lutzko Dep., Dkt. 58, at 89; Milles Dep., Dkt. 58, at 49). In the Fifth Circuit, courts may draw an "adverse inference" against a party to a civil action when the party refuses to testify in response to probative evidence offered against them. *Farace v. Independent Fire Ins. Co.*, 699 F.2d 204, 210 (5th Cir. 1983). The decision to draw an adverse inference based on a defendant's invocation of the Fifth Amendment in a civil proceeding is left to the discretion of the District Court. *Hinojosa v. Butler*, 547 F.3d 285, 292 (5th Cir. 2008) (citing *FDIC v. Fid. & Deposit Co.,* 45 F.3d 969, 977 (5th Cir. 1995)). Courts have drawn an adverse inference based on a party's invocation of the privilege in a civil case, especially where other evidence demonstrated that party's liability. *See W.L. v. Zirus*, No. SA-19-CV-00607-FB, 2020 WL 6703238, at *5 (W.D. Tex. Nov. 12, 2020); *see also State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 119 (5th Cir. 1990) (declining to draw an adverse inference based on party's invocation of the privilege because the opposing party had "failed to present any other evidence to bolster the inference").

In addition, Defendants' response to the SEC's motion does not meet its burden to create a fact issue. (*See generally* Resp., Dkt. 64). Defendants' only response to the SEC's evidence is that Vera "defrauded them" and gave them information about the oil wells, which they passed on to investors. (*Id.* at 2). However, this response does not rebut the SEC's probative evidence that Defendants misrepresented CEG's oil production prospects and their own expertise; paid investors "production" payments using other investors' money; were aware that the only money in CEG's accounts was from investors and misled investors when that money ran out; and made use of the mails to defraud investors. (*See supra* Sections III.A, III.B). Further, Defendants do not cite any evidence that disputes the SEC's evidence or purports to show Vera's role in the scheme. Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Turner*, 476 F.3d at 343. Along with their response, Defendants attach

11

130 pages of documents, (*see* Dkt 64-1), but they do not refer to these documents in their response. In sum, Defendants fail to identify specific evidence in the record and articulate the precise manner in which that evidence supports their claim. *Adams*, 465 F.3d at 164. The Court is not required to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*

For these reasons, the Court holds that Defendants have not defeated the SEC's motion for summary judgment. The Court draws an adverse inference based on Defendants' failure to respond to the SEC's incriminating evidence during discovery, as the SEC has provided ample evidence to bolster the inference and Defendants have not directed the Court to any evidence that would dispute their liability. *See W.L.*, No. SA-19-CV-00607-FB, 2020 WL 6703238, at *5; *see also Gutterman*, 896 F.2d at 119. Further, Defendants do not refer to any evidence in their response to contradict the SEC's evidence and create a fact issue. Summary judgment must be granted in favor of the SEC.

## IV. RELIEF

### A.  The SEC Has Offered Sufficient Evidence for the Court to Enter a Permanent Injunction

Injunctive relief is expressly authorized by Congress to proscribe future violations of the federal securities laws. *SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998). The Securities Act and the Exchange Act each provide for injunctive relief when their provisions have been violated. *See* 15 U.S.C. §§ 77t(b), 78u(d). Pursuant to those provisions, a defendant may be permanently enjoined from further violations of the acts. *Id.*

To establish the need for a permanent injunction, the SEC must show that Defendants violated the securities laws and that there is a reasonable likelihood that each will engage in future violations if not enjoined. *See Cavanagh*, 155 F.3d at 135; *SEC v. Commonwealth Chem. Sec., Inc.*, 574

F.2d 90, 99–100 (2d Cir. 1978); *SEC v. K.W. Brown & Co.*, 555 F. Supp. 2d 1275, 1311 (S.D. Fla. 2007); *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 383 (S.D.N.Y. 2007).

In assessing the likelihood of future violations, courts consider the totality of the circumstances surrounding the defendant and his violations. *SEC v. Zale Corp.*, 650 F.2d 718, 720–21 (5th Cir. 1981). A court considers the following factors in determining whether there is a reasonable likelihood of future violations: (1) the egregiousness of the defendant's actions; (2) the isolated or recurrent nature of the violations; (3) the degree of scienter involved; (4) the defendant's recognition of the wrongful nature of his conduct; (5) the sincerity of the defendant's assurances against future violations; and (6) the likelihood that defendant's occupation will present opportunities for future violations. *K.W. Brown & Co.*, 555 F. Supp. 2d at 1311; *see also Cavanagh*, 155 F.3d at 135. "No single factor is determinative; instead, the district court should determine the propensity for future violations based on the totality of circumstances." *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1228 (D.C. Cir. 1989).

The SEC's allegations and the totality of the circumstances weigh in favor of granting an injunction. The SEC has sufficiently alleged that Defendants violated multiple securities laws, beginning in 2014, and that this is not the first time Defendants have engaged in fraudulent securities schemes. Defendants have not offered any assurances against future violations. Accordingly, a permanent injunction is warranted.

**B.  The SEC Has Offered Sufficient Evidence for the Court to Assess Monetary Remedies**

A court may order a party to disgorge net profits flowing from securities law violations to prevent the wrongdoer from enriching himself by his wrongs. *Liu v. SEC*, 140 S. Ct. 1936, 1943 (2020). Further, a court may order equitable relief against "a person who is not accused of wrongdoing in a securities enforcement action where that person: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds." *SEC v. George*, 426 F.3d 786, 798 (6th Cir.

13

2005) (quoting *SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998)); *SEC v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998). Finally, an award of prejudgment interest prevents wrongdoers from benefitting from what is, in effect, an interest-free loan resulting from their illegal activity. *SEC v. Evolution Capital Advisors, LLC*, 2013 WL 5670835, *3 (S.D. Tex. Oct. 16, 2013).

Additionally, the Court is authorized to assess civil penalties by Section 20(d) of the Securities Act of 1933 and Section 21(d) of the Securities Exchange Act of 1934, which establish an escalating, three-tier structure for securities violations depending upon the egregiousness of the defendant's conduct. 15 U.S.C. §77t(d); 15 U.S.C. §78u(d)(3), and 17 C.F.R. 201.1001 (increasing statutory amounts to reflect inflation). Congress enacted these penalty provisions "to achieve the dual goals of punishment of the individual violator and deterrence of future violations." *SEC v. Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 17 (D.D.C. 1998). A civil penalty is necessary because "disgorgement . . . does not result in any actual economic penalty or act as a financial disincentive to engage in securities fraud . . . ," and ". . . is necessary for the deterrence of securities law violations that otherwise may provide great financial returns to the violator." *SEC v. Moran*, 944 F. Supp. 286, 296 (S.D.N.Y. 1996) (quoting H.R. Rep. No. 101-616 (1990)).

The SEC has sufficiently alleged that Defendants violated securities law and have no legitimate claim to the investor funds they acquired. The Court will order that Defendants pay disgorgement with prejudgment interest and civil penalties in amounts to be determined by the Court after an appropriate motion from the SEC.

## V. CONCLUSION

For the reasons stated above, **IT IS ORDERED** that the SEC's Motion for Summary Judgment, (Dkt. 51), is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants are permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the

"Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

>   (a) to employ any device, scheme, or artifice to defraud;
>
>   (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or
>
>   (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

**IT IS FURTHER ORDERED** that Defendants are permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

>   (a) to employ any device, scheme, or artifice to defraud;
>
>   (b) to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
>
>   (c) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

**IT IS FURTHER ORDERED** that Defendants are permanently restrained and enjoined from violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a), (c)] by, directly or indirectly, in the absence of any applicable exemption:

>   (a) Unless a registration statement is in effect as to a security, making use of any

means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise, or

(c) Making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed with the Commission as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under Section 8 of the Securities Act [15 U.S.C. § 77h].

**IT IS FURTHER ORDERED** that Defendants are permanently restrained and enjoined from directly or indirectly, including, but not limited to, through any entity they own or control, participating in the issuance, purchase, offer, or sale of any security. This injunction shall not prevent Milles or Lutzko from purchasing or selling securities for their own personal accounts.

**IT IS FURTHER ORDERED** that Defendants shall pay a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**IT IS FURTHER ORDERED** that Defendants shall disgorge ill-gotten gains and benefits obtained or to which they were not otherwise entitled, as a result of the violations described in the Complaint, (Dkt. 1), plus prejudgment interest on those amounts.

The Court shall determine the amounts of the disgorgement and civil penalty upon motion of the SEC. Prejudgment interest shall be calculated from July 17, 2019, based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2).

**IT IS FINALLY ORDERED** that the SEC shall file either a motion addressing the appropriate amounts for monetary penalties or a report apprising the Court of the status of this case on or before **March 22, 2022**.

**SIGNED** on January 24, 2022.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE